UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Randall J. May,

        Plaintiff,

v.                                              **MEMORANDUM OPINION AND ORDER**

Delta Air Lines,                      Civil No. 21-710 ADM/ECW

        Defendant.

___

Randall J. May, pro se.

Ben D. Kappelman, Esq., and Charles Pults, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of Defendant.

___

## I. INTRODUCTION

On April 21, 2022, the undersigned United States District Judge heard oral argument on both Plaintiff Randall J. May's ("May") Motion for Summary Judgment [Docket No. 36] and Defendant Delta Air Lines, Inc.'s ("Delta") Motion for Summary Judgment [Docket No. 48]. May alleges that Delta violated the Americans with Disabilities Act ("ADA") by failing to provide a reasonable accommodation for his disability and by subjecting him to harassment based on his disability. He also argues that he was constructively discharged because of his disability. For the reasons set forth below, May's Motion is denied and Delta's Motion is granted.

## II. BACKGROUND

**A. May's Part-Time and Seasonal Ramp Agent Positions**

In April 2016, May began working as a ramp agent for Delta. Kappelman Decl. Ex. A ("May Dep.") [Docket No. 55] at 43, 46, 52. The duties of a ramp agent include transporting

customer luggage to and from the aircraft, and loading and unloading the aircraft. Id. at 43-44. Delta employs full-time, part-time, and seasonal ramp agents. First Grenz Decl. [Docket No. 51] ¶¶ 6-8. May was hired as a Ready Reserve Ramp Agent, which is a year-round, part-time position. Id. ¶ 8; May Dep. at 52. May worked three days per week in this position. May Dep. at 47, 51.

In November 2017, May changed positions to a Seasonal Ready Reserve Ramp Agent. Id. at 58. The seasonal position required May to increase his work schedule from three days per week to five days per week. Pl. Mem. Opp'n Summ. J. [Docket No. 60] at 2. Unlike the nonseasonal Ready Reserve Ramp Agent position, part-time schedules were not available for Seasonal Ready Reserve Ramp Agents because Delta used Seasonal Ready Reserve Ramp Agents to meet high demand during Delta's two busiest seasons---summer and the winter holidays. First Grenz Decl. ¶ 7; Gajria Decl. [Docket No. 52] ¶ 10. Because of the seasonal demands, Delta policy specified that Seasonal Ready Reserve Ramp Agents "must be available to work up to 40 hours during each week of the peak season(s) and the schedule will be determined by the local leadership based on operational needs." Gajria Decl. ¶ 10, Ex. A. Seasonal Ready Reserve Ramp Agents were required to sign a form acknowledging this policy. Id. Ex. A.

The full-time schedule requirement for Seasonal Ready Reserve Ramp Agents was also dictated by Delta's corporate budgeting system, which allocated the number of full-time equivalent employees ("FTEs") that could work as ramp agents at the Minneapolis-St. Paul ("MSP") location. First Grenz Decl. ¶ 8. The system counted the Seasonal Ready Reserve Ramp Agent position as 1 FTE. Id. If a ramp agent worked less than full time in that position,

Delta's MSP location would potentially be short staffed even though the maximum number of authorized FTEs were employed. Id.

After May had completed the winter season, Delta offered him a position as a Seasonal Ready Reserve Ramp Agent for the 2018 summer season. May Dep. at 62-63. The only available schedules for the 2018 summer season were five days per week. Id. at 68, 121; Gajria Decl. ¶ 10; First Grenz Decl. ¶ 9. May bid on and received a five-day-per-week schedule. May Dep. at 68.

After working this schedule for a few weeks, May asked Delta's scheduler if he could work one less day per week. Id. May did not tell the scheduler why he was requesting a reduced schedule. Id. The scheduler denied May's request. Id.

**B. May's Request for Accommodation**

On June 2, 2018, May asked Delta for forms to initiate a job accommodation request based on a medical impairment. Id. at 76; Kappelman Decl. Ex. E ("Dep. Ex. 6") [Docket No. 54, Attach. 1] at 2. An accommodation program manager responded on June 4 by asking what accommodation May was requesting. May Dep. at 77; Dep. Ex. 6 at 2. May replied that he had Bipolar Affective Disorder and was seeking to reduce his schedule as a Seasonal Ready Reserve Ramp Agent from five days per week to three days per week. May Dep. at 77-78; Dep. Ex. 6 at 2. The next day, May was provided with forms and instructions for requesting an accommodation. May Dep. at 78-79; Dep. Ex. 6 at 1.

On June 15, 2018, Delta's accommodation program received a fax from May's psychiatrist that included a physician's certification for job accommodation, as well as an accommodation request form that May had completed. May Dep. at 79-83; Kappelman Dec. Ex. F ("Dep. Ex. 7") [Docket No. 54, Attach. 1]. The psychiatrist identified May's restrictions as "3

days/week," which would be "Temporary" for "1 year." May Dep. at 80; Dep. Ex. 7 at DELTA000028. On the accommodation request form, May wrote that his impairment of Bipolar Affective Disorder does not affect his ability to do his job "in a part time manner," but that he becomes "agitated and irritable [when] working more than three-day weeks," and that he needed "a 3-day 8 hour schedule or 4 day 6 hour schedule." May Dep. at 82; Dep. Ex. 7 at DELTA000029. The form asked how the requested accommodations would enable him to perform his job, and May answered, "I will not have the frustration and spikes in mood I have with the longer five-day workweek." Dep. Ex. 7 at DELTA000029.

Accommodation program manager Annelyse Greene ("Greene") reviewed the forms on June 22, 2018, and telephoned May's psychiatrist's office to clarify the medical necessity for May to work three days per week. Gajria Decl. ¶ 13, Ex. B at DELTA000047. After receiving a response from the psychiatrist on June 28, Greene asked May to attend a July 2 meeting to discuss his accommodation request. Id. Ex. B at DELTA000047-48.

C.  **First July 2, 2018 Meeting**

On July 2, 2018, May arrived at Delta's administrative offices for the meeting and waited in the reception area. May Dep. at 94. Delta General Manager Kelly Patton ("Patton") came to the reception area to escort May to the meeting. Id. May greeted Patton, and Patton asked May how he was doing. Id. The parties disagree about what May said in response. May contends that he responded, "Well, I'm frustrated with this process, but I haven't blown up at anybody over it yet." Id. at 95. Patton's version as reported to human resources manager Leah Gajria ("Gajria") was that May's answer was that he had not "blown anyone up today." Gajria Decl. ¶ 14.

4

Patton proceeded to bring May to the meeting, where the two of them joined Gajria and safety manager Jay Hassett. Accommodation program manager Greene attended by phone. May Dep. at 88-89; Gajria Decl. Ex. B at DELTA000048. May explained in the meeting that he was seeking an accommodation because his psychiatrist had approved him to work three days per week, but his scheduling manager told him he was needed for five days per week. May Dep. at 89-90; Gajria Decl. Ex. B at DELTA000048. Patton informed May that Seasonal Ready Reserve Ramp Agents are scheduled to work 40 hours per week between June and August, and that three-day-per week schedules were not available. May Dep. at 90; Gajria Decl. ¶¶ 10-11, Ex. B at DELTA000048. May was told that he could finish his shift for the day, but that he could no longer continue working as a Seasonal Ready Reserve Ramp Agent because he was not medically able to meet the five-day-per-week requirements of that position. May Dep. at 90; Gajria Decl. ¶ 11.

Gajria avers that May was told during the meeting that he could take an unpaid leave of absence as an accommodation and that he should request leave by contacting Delta's leave administrator, Sedgwick Claims Management Services ("Sedgwick"). Gajria Decl. ¶ 11, Ex. B at DELTA000048. May testified in his deposition that he was not told to contact Sedgwick, and that instead Patton told him, "This is your last day for a year." May Dep. at 91. May does not dispute, however, that Sedgwick sent him a letter in August 2018 stating that he had been approved for unpaid disability leave from July 3, 2018 through July 19, 2018. Id. at 93; Kappelman Decl. Ex. B ("Dep. Ex. 2") [Docket No. 54, Attach. 1].

During the meeting, May was also told that he would be accommodated through Delta's Alternative Position Assistance program. The program assists employees who are unable to perform essential functions of their current jobs to identify new jobs within Delta that they can

5

perform with or without reasonable accommodations. May Dep. at 89-90; Gajria Decl. ¶ 12, Ex. B at DELTA000048.

### D. Second July 2 Meeting

May returned to his work site after the meeting, but half an hour later he was summoned back to Patton's office where Patton, Gajria, and Delta Corporate Security representative Anthony Spencer ("Spencer") were waiting. May Dep. at 101-03; Gajria Decl. ¶ 15. Spencer told May that Patton had reported that May made a statement about "blowing something up," which was deemed to be a threat. May Dep. at 105. Delta maintains a "zero tolerance policy" that prohibits "violence or threats of violence against one another, our customers, aircraft or other people or property. May Dep. at 114-15; Kappelman Decl. Ex. N ("Dep. Ex. 9") [Docket No. 54, Attach. 3] at DELTA0000256.

Spencer asked May about the events of the day, and May explained that he had attended an accommodation meeting for his disability of Bipolar Affective Disorder. May Dep. at 104. According to May, Spencer then asked May several questions about his illness and eventually stated, "Well, it seems like you need your meds rechecked." Id. at 104.

At the end of the meeting, Spencer concluded that Patton had misheard or misconstrued May's statement. Id. at 106. Although May maintains that he said he had not "blown up at anyone," rather than that he had not "blown up anyone," he concedes that had he made the latter comment it would have been a serious matter because "[b]lown up can mean explosion," and such a threat should be reported as a "matter of public safety." Id. at 96-97.

Following this meeting, Patton determined that May should be sent home for the day with pay and not finish his shift because he was upset. Id. at 109; Gajria Decl. ¶ 18. May's Secured Identification Display Area ("SIDA") badge, Delta employee badge, and parking permit were

6

collected from him before he left. May Dep. at 110; Gajria Decl. ¶ 19. Human resources manager Gajria avers that it is common to retain an employee's badges when the employee is on indefinite leave. Gajria Decl. ¶ 19. Department manager Steven Grenz ("Grenz") similarly attests that Delta attempts to retain its employees' SIDA badges when it is anticipated that the employee will not be working for a period of time, because SIDA badges are issued by the Metropolitan Airports Commission ("MAC") to individuals whose jobs require access to secure areas at airports, and Delta is responsible for ensuring that SIDA badges are not in possession of employees who are not working at regular intervals. First Grenz Decl. ¶ 12.

### E. May's Return to Work

On July 3, 2018, May emailed Patton and Gajria asking, "What is my status at Delta? Because having been removed from the company grounds with extreme prejudice and having all my credentials taken from me including my parking permit resembled being fired. If I'm not fired, why was my EMPLOYEE ID taken from me?" Kappelman Decl. Ex. H ("Dep. Ex. 10") [Docket No. 54, Attach. 1] at DELTA000866. Patton replied the same day, stating, "You are not terminated. You are still a Delta employee." Id.

May also asked Patton and Gajria about why Delta would not alter his schedule as a Seasonal Ready Reserve Ramp Agent to accommodate his disability. Id. Patton offered to address those questions in a conference call with May, Gajria, and Patton. Id. May was not comfortable participating in the call unless an executive-level manager was included. Id.; Kappelman Decl. Ex. I ("Dep. Ex. 11") [Docket No. 55, Attach. 1] at DELTA000879.

On July 5, May sent emails to three upper-level Delta managers, including Lori Dehn ("Dehn"), about his accommodation request. Dep. Ex. 11 at DELTA 000878. Dehn replied the same day and offered to participate in a call with May the following Tuesday, July 10. Id. A

7

conference call was then held on July 10, 2018, during which Dehn discussed May's accommodation request with May, Patton, and Gajria. May Dep. at 140; Gajria Decl. ¶¶ 20-21. May understood during the call that Dehn was changing his position to a non-seasonal Ready Reserve Ramp Agent so that he could work a three-day-per-week schedule and that he would return to work on July 20. May Dep. at 140-42; Gajria Decl. ¶ 21.

The next morning, May emailed Dehn to thank her for her help and told her, "I love my job and knowing that I'm going to be going back to it is a huge weight lifted off both mine and my wife's shoulders. She too is a Delta employee and we love working for the same company." May Dep. at 142-43; Kappelman Decl. Ex. J ("Dep. Ex. 13") [Docket No. 54, Attach. 2].

After an unpaid leave of absence from July 3 to July 19, 2018, May returned to work on July 20 as a nonseasonal Ready Reserve Ramp Agent on a three-day-per week schedule at the same hourly rate. May Dep. at 93, 144; Gajria Decl. ¶ 22. May worked this schedule until October 2018, when the spring/summer schedules for non-seasonal Ready Reserve Ramp Agents ended and the fall/winter schedules began. May Dep. at 144-45; Second Grenz Decl. [Docket No. 63] ¶ 3.

**F.  Fall 2018 Shift-Bidding Process**

On September 27, 2018, May participated in the fall shift-bidding process[1] and bid on a 2:00-8:30 p.m. shift working four days per week at airport gate F-13. May Dep. at 146, 149. At the time May bid on the four-day-per-week schedule, multiple three-day-per-week schedules

---

[1] Delta creates schedules for ramp agents at the beginning of each season based on operational needs. First Grenz Decl. ¶¶ 2-5. The schedules are referred to as "bid lines" and are allocated to ramp agents based on seniority. Id. ¶ 6. In 2018, the fall shift-bidding process for non-seasonal Ready Reserve Ramp Agents at MSP occurred in late September. Second Grenz Decl. ¶ 3. The fall/winter schedules began near the end of October and continued through the holiday season and into the new year. Id.

were available to May based on his seniority date.  Id. at 146, 149; Second Grenz Decl. ¶¶ 12-15, Ex. B.

The next day, May contacted Dehn to request that his schedule be changed from four days to three.  May Dep. at 145-46, 150.  Dehn responded that doing so would result in a new schedule that would need to be posted to the bid-shifting process so that employees with more seniority would have the opportunity to bid on the new schedule.  Id. at 150-51.  May was then offered a three-day-per-week, eight-hour-per-day shift working in a "relief" position.  Id. at 151-52.  A "relief" position is a floating employee who can be assigned to any location, such as the bag room or transferring bags, rather than being assigned to a specific gate.  Id. at 153-54.  May chose not to work this relief position because he preferred to be assigned to a specific location in the airport.  Id.  May informed Dehn that if the four-day-per-week schedule he initially bid on could not be altered, he would find a co-worker to work one day of his shift each week from November until May.  Id. at 153.

On October 23, 2018, May again discussed his schedule with Delta and was offered a three-day-per-week shift as a "G-local" Ready Reserve Ramp Agent.  Id. at 160-61; Second Grenz Decl. Ex. C.  May did not want this shift because "G-local . . . means you were a baggage runner, that you drive your cart -- or carts and a tug to the gates, and you simply take the MSP destination bags and run them and throw them.  So you're not on a gate itself; you're kind of just a chauffeur of local bags.  And, obviously, like I -- well, I said earlier I preferred the gates, which meant working the flights, getting in the aircraft, not simply just showing up to random gates."  May Dep. at 161.

May inquired about another three-day schedule---bid line 4141---and was told that a more senior employee had taken bid line 4141 so it was not available to him.  Second Grenz Decl. Ex.

9

C at 1.  May decided to remain in the four-day-per-week schedule that he initially bid on and to trade shifts with a co-worker so that he could work three days per week at a particular gate.  May Dep. at 162.

**G.  May's EEOC Charge, Resignation, and Lawsuit**

On October 4, 2018, May submitted a charge of discrimination to the Equal Opportunity Employment Commission ("EEOC").  Id. at 164-66; Kappelman Decl. Ex. K ("Dep. Ex. 17") [Docket No. 54, Attach. 2].  May asserted that the discrimination occurred between June 7, 2018 and July 19, 2018.  Dep. Ex. 17 at 1.

On October 9, 2018, Delta sent May a letter memorializing the accommodations process that had occurred in July.  Compl. [Docket No. 1] ¶ 5, Ex. 2.  Although the letter was sent in October 2018, it was dated July 30, 2018.  May alleges that the letter was "fraudulently backdat[ed]."  Compl. ¶ 5.

On November 21, 2018, May contacted Sedgwick to request unpaid leave because of "some stress with coworkers."  May Dep. at 174; Kappelman Decl. Ex. L ("Dep. Ex. 20") [Docket No. 55, Attach. 2].  In his deposition, May described the stress as co-workers making comments to him about his July 2 request for accommodations and his charge with the EEOC.  May Dep. at 175-76.  Some of the comments were supportive but others were insulting.  Id.  May does not remember any specific comments that were unwelcome and does not recall telling any Delta managers or executives about the comments.  Id. at 176.

On December 3, 2018, May submitted a letter of resignation from his employment with Delta effective December 16, 2018.  May Dep. at 178; Kappelman Decl. Ex. M ("Dep. Ex. 21") [Docket No. 54, Attach. 3].  May testified in his deposition that he resigned:

> Because the stress of this all, especially after Delta had sent a backdated letter and Delta had responded to the EEOC claim in the way they did, it was all pushing me to the point

of a mental breaking point. So trying to get this disability leave or not, it was going to put me in danger of hospitalization, of mental instability to the point of where I would be episodic. And so I quit because this wasn't coming to resolution via Delta, via the EEOC; and I had had enough. I wasn't going to be hospitalized for some stupid airline.

May Dep. at 179.

On January 27, 2021, the EEOC issued a no cause finding and a right to sue letter [Docket No. 1, Attach. 2]. May filed this ADA lawsuit on March 15, 2021. See generally Compl. The parties have filed cross motions for summary judgment.

### III.  DISCUSSION

**A.  Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment." Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992). "Instead, 'the dispute must be outcome determinative under prevailing law.'" Id. (quoting

Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir.1989)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc).

### B. Americans with Disabilities Act

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). May alleges in the Complaint that Delta discriminated against him by failing to accommodate his disability of bipolar affective disorder, and by subjecting him to harassment because of his disability. Compl. ¶ 8. He also has added in his summary judgment response a claim that he was constructively discharged. Pl. Resp. Summ. J. at 4. Each claim is analyzed below.

#### 1. Failure to Accommodate

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 2112(b)(5)(A). A plaintiff making an accommodation claim "must first make a facial showing that he has an ADA disability and that he has suffered adverse employment action. Then he must make a facial showing that he is a 'qualified individual.'" Fenney v. Dakota, Minnesota & E. R. Co., 327 F.3d 707, 712 (8th Cir. 2003). "To qualify for a position, the employee must be able to 'perform the essential functions of such position.'" McNeil v. Union Pac. R.R. Co., 936 F.3d 786, 789 (2019) (quoting 29 C.F.R. § 1630.2(m)).

An employer who disputes a failure-to-accommodate claim on the basis that the employee could not perform an essential function of the position must establish that the function is essential. Id. Relevant factors may include: "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing

applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." Id. at 789-90.

The evidence shows that working full-time was an essential function of the Seasonal Ready Reserve Ramp Agent position in 2018. Part-time schedules were not available for Seasonal Ready Reserve Ramp Agents because full-time schedules were required to meet operational demand during Delta's two busiest seasons---summer and the winter holidays. First Grenz Decl. ¶ 7; Gajria Decl. ¶ 10. Delta had a written policy specifying that Seasonal Ready Reserve Ramp Agents "must be available to work up to 40 hours during each week of the peak season(s) and the schedule will be determined by the local leadership based on operational needs." Gajria Decl. ¶ 10, Ex. A. Seasonal Ready Reserve Ramp Agents were required to sign a form acknowledging this policy. Id. Ex. A. The consequences of not requiring a Seasonal Ready Reserve Ramp Agent to work full time were that Delta's MSP operation would potentially be short-staffed even though it was employing the maximum number of employees that were budgeted for the position. First Grenz Decl. ¶ 8. Because the Seasonal Ready Reserve Ramp Agent position was budgeted as a full-time-equivalent position, if an employee were permitted to work less than full-time in this position, the employee would be occupying a full-time-equivalent position but would be working less than full-time hours. Id. ¶¶ 7-8. This would leave the ramp agents short-handed despite having a full allocation of full-time equivalent workers.

Because working full-time was an essential function of the Seasonal Ready Ramp Reserve Agent position, May's medical restriction of working three 8-hour days per week disqualified him from performing this position. Moreover, Delta was not required to create a part-time Seasonal Ready Reserve Ramp Agent position to accommodate May's inability to

perform the essential functions of the position. See Treanor v. MCI Telecomms. Corp., 200 F.3d 570, 575 (8th Cir. 2000) ("[T]he ADA does not require an employer to create a new part-time position where none previously existed."). As such, May has not made a facial showing that he was a qualified individual under the ADA.

May also has not made a facial showing that he suffered an adverse employment action. Delta responded to May's accommodation request by providing him with temporary unpaid leave, followed by moving him to a position (non-seasonal Ready Reserve Ramp Agent) that permitted him to work a three-day-per-week schedule. "When an accommodation is not possible in an employee's current position, reassignment to a vacant position may be a reasonable accommodation." Faidley v. United Parcel Serv. of Am., Inc., 889 F.3d 933, 941 (8th Cir. 2018) (quotation marks omitted).

After the summer season had ended and the fall shift-bidding process began, Delta repeatedly offered May shifts that met the three-day-per-week, eight-hour-per-day accommodation requested by May. Although May preferred other shifts over the ones that were offered, "[a]n employer only has to provide an accommodation that is reasonable, not an accommodation the employee prefers." Id. at 942–43 (quotation marks omitted).

May argues that he suffered an adverse employment action because he was "forcefully" placed on leave despite not requesting any leave. Pl. Mem. Opp. Summ. J. at 4. However, a brief period of unpaid leave pending further accommodation is not an adverse employment action. See Austgen v. Allied Barton Sec. Servs., L.L.C., 815 F. App'x 772, 775 (5th Cir. 2020) (holding that temporary unpaid leave of "a few weeks" was not an adverse employment action because "even assuming that [plaintiff] incurred some financial loss by being put on unrequested leave, . . . [the employer] reasonably accommodated [plaintiff's] alleged disability given its

14

timely response and ultimate transfer to a comparable position"). May's period of unpaid leave was July 3 through July 18, 2018.

Because May has failed to make a facial showing that he was a qualified individual or that he suffered an adverse employment action, Delta is entitled to summary judgment on May's failure-to-accommodate claim.

### 2. Harassment

The factual basis for May's claim of harassment based on his disability is the July 2, 2018 incident when he was accused of making a terroristic threat, told by security officer Spencer that "you need to have your meds rechecked," escorted off the premises, and had his SIDA badge, employee badge, and parking permit confiscated. Pl. Mot. Summ. J. ¶¶ 2-3; Pl. Response [Docket No. 60] at 2, 5.

To prevail on a claim for harassment under the ADA, a plaintiff must show "that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment." Ryan v. Capital Contractors, Inc., 679 F.3d 772, 778 (8th Cir. 2012) (quoting Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir.2003)). The Eighth Circuit has "repeatedly emphasized that anti-discrimination laws do not create a general civility code." Shaver, 350 F.3d at 721. "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." Id.

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of the plaintiff's employment." Kelleher v. Wal-Mart Stores, Inc.,

15

817 F.3d 624, 634 (8th Cir. 2016) (quotation marks omitted).  Under this demanding standard, the "harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'"  Shaver, 350 F.3d at 721 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Kelleher, 817 F.3d at 634 (quoting Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006)).

As an initial matter, Delta's security measure in questioning May about his comment, made at the airport, whether he said he had not "blown up anyone today" or "blown up at anyone today" is not evidence of disability-based harassment.  See Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998) (rejecting theory that security measures taken after supervisor heard that plaintiff was contemplating carrying a gun were evidence of discrimination).  May admits that he used the phrase "blown up," and he concedes that had he stated, "I haven't blown up anyone today" (rather than "I haven't blown up at anyone today"), the comment would be a serious matter because "[b]lown up can mean explosion," and such a threat should be reported as a "matter of public safety."  May Dep. at 96-97.

Additionally, the conduct on which May bases his harassment claim was not sufficiently severe or pervasive to affect a term, condition, or privilege of his employment.  With respect to security officer Spencer's comment to May that "you need to have your meds rechecked," this isolated incident is not severe or pervasive enough to create an objectively hostile or abusive work environment.  Additionally, there are no allegations or evidence to suggest that May was

subjected to conduct that was "explicitly or implicitly threatening," or physical in nature. Shaver, 350 F.3d at 722.

As to Delta's retention of May's SIDA badge, employee badge, and parking permit, the record shows that it was Delta's practice to retain an employee's badges when the employee is going to be on indefinite leave. Gajria Decl. ¶ 19; First Grenz Decl. ¶ 12. May argues that "stripping an employee ID and parking permit would only be done when firing an employee," and that these actions were taken "in the hope that I would be dissuaded from attempting to return to my employment since [Patton] effectively fired me." Pl. Reply [Docket No. 61] at 1. However, the evidence shows that May specifically asked whether the taking of his employee badge and parking permit meant that he was fired, and Patton responded, "You are not terminated. You are still a Delta employee." Dep. Ex. 10 at 3.

Because May has not adduced sufficient evidence to support a claim of disability-based harassment, summary judgment is granted to Delta on this claim.

### 3. Constructive Discharge

Finally, May argues in his opposition brief that he was constructively discharged when he resigned on December 3, 2018. Pl. Resp. Mot. Summ. J. at 4. May contends that "[a]fter being denied accommodation, Delta forced Mr. May to fight for his employment in a way that accommodates his disability. Once it became clear that Mr. May would have to do this every six months, his employment became untenable." Id.

May did not raise this claim in his EEOC charge, which was filed on October 4, 2018, two months before May resigned. The EEOC charge describes the discrimination as occurring between June 7, 2018 and July 19, 2018, and does not mention the fall shift-bidding process that occurred in late September 2018. May Dep. Ex. 17 at 1.

The ADA requires plaintiffs to exhaust their administrative remedies by filing a charge with the EEOC before commencing a federal lawsuit. Voss v. Hous. Auth. of the City of Magnolia, Arkansas, 917 F.3d 618, 623 (8th Cir. 2019). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice that must be individually addressed before the EEOC." Id. (quotation marks and emphasis omitted). By not including in his EEOC charge the adverse acts which May contends forced him to resign (i.e., bidding for a three-day-per-week schedule every six months), May failed to exhaust his administrative remedies on his constructive discharge allegation.

May's constructive discharge claim is also barred because he did not raise it in his Complaint. May used a form to prepare his Complaint and stated on the form that the discrimination occurred on July 2, 2018. Compl. ¶ 5. When describing "[t]he conduct complained of in this law suit," May selected "Failure to accommodate my disability" and "Harassment" from a list of conduct provided on the form. Id. ¶ 8.d., 8.g. The list included an option for "Termination of my employment," but May did not select this option. Id. 8.b. May does not mention constructive discharge anywhere in his Complaint, and does not reference any events after July 2018 except the allegedly "fraudulently backdated letter [sent] on 10/9/2018 by Delta." Id. ¶ 10. Because the Complaint does not mention constructive discharge, the theory is now barred. See Field v. Tonawanda City Sch. Dist., 604 F. Supp. 2d 544, 568 (W.D.N.Y. 2009) (refusing to consider constructive discharge theory not asserted in complaint).

Even if the constructive discharge claim were properly before the Court, May has not presented sufficient evidence for the claim to survive summary judgment. To prevail on a claim for constructive discharge, a plaintiff must show: "(1) a reasonable person in his situation would find his working conditions intolerable, and (2) the employer intended to force him to quit.

18

Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 186 (8th Cir. 2014) (quotation marks and alterations omitted).  A plaintiff who cannot show sufficient facts to infer a hostile work environment also cannot prove constructive discharge.  Id.  As discussed above, May has not shown sufficient evidence to infer an objectively hostile or abusive work environment.  Additionally, requiring May to participate in the shift-bidding process every six months, just as every other ramp agent was required to do, does not amount to objectively intolerable working conditions.  Therefore, May cannot prove constructive discharge.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Randall J. May's Motion for Summary Judgment [Docket No. 36] is **DENIED**;

2. Defendant Delta Air Lines, Inc.'s Motion for Summary Judgment [Docket No. 48] is **GRANTED**; and

3. The Complaint [Docket No. 1] is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: July 20, 2022

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT